(No. 54366.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant,
v. BERNICE LEWIS, Appellee.

*Opinion filed November 13, 1981.—Rehearing denied*
*January 29, 1982.*

SIMON, J., specially concurring.

Tyrone C. Fahner, Attorney General, of Springfield (Melbourne A. Noel, Jr., Michael B. Weinstein, Susan M. Sherwin, and Neal B. Goodfriend, Assistant Attorneys General, and Jay Stein, law student, of Chicago, of counsel), for the People.

Dobrovolny & Souk, of Urbana (James E. Souk, of counsel), for appellee.

JUSTICE UNDERWOOD delivered the opinion of the court:

Defendant, Bernice Lewis, was convicted in a jury trial in the Champaign County circuit court of murder, armed robbery and aggravated kidnaping in connection with the December 14, 1978, robbery of the Citizens National Bank in Decatur and the death of Donald Bivens, Sr., a bank security guard. The appellate court (90 Ill. App. 3d 220) reversed, holding that defendant had been deprived of effective assistance of counsel, and ordered a new trial.

Defendant, a resident of Des Moines, Iowa, was indicted with her brother, Cornelius Lewis, who had allegedly fired the shot that killed decedent. At defendant's arraignment on March 1, 1979, it was determined that she was indigent and Scott Diamond, the Macon County public defender, was appointed to represent her. Attorney Diamond was also appointed to represent Willie Sangster, who had been separately charged with the same crimes. On March 2, 1979,

the lawyer filed a petition for instructions as to whether he should continue to represent defendant. The petition indicated that the attorney had known decedent due to the latter's prior position as an assistant probation officer and had attended decedent's funeral. The petition stated in part:

"That the Petitioner does not feel that the fact that he did know Mr. Bivens would have any effect on giving the Defendant a vigorous defense, however, Defendant claims that due to my relationship with Mr. Bivens, she feels that I cannot fairly defend her."

A similar petition was filed with respect to Sangster. On March 9, 1979, a hearing was held to consider whether attorney Diamond should continue to represent defendant and Sangster. The attorney testified:

"The victim of the alleged murder was Donald Bivens, Sr. Donald Bivens, Sr. had formerly been assistant probation officer in Macon County and for approximately six years I have been Public Defender of Macon County. For six years I did have a working relationship with Mr. Bivens, although I did not ever visit him in his home. My relationship was basically at work and I did consider him a friend. The defendants have raised the issue whether or not they feel I could do a fair job for them due to my relationship with Mr. Bivens. It is true I did attend his funeral, but I personally feel if appointed, I would do my job and I would intend to perform my duty. As they have raised the issue, I feel I must bring the issue before the Court. For this reason, I am asking the Court for instructions whether or not I should proceed with the cases."

Sangster was asked his position with respect to representation by attorney Diamond and replied:

"My position on that, Your Honor, is that I feel totally uncomfortable with him representing me because of the fact that we have had various conversations on this subject and I personally feel and I hope that the Court, I beg the Court to agree with me that this man's relationship with the person that was killed in the bank robbery was such that it would be utterly

impossible for him to give me, to defend me with the enthusiasm that is necessary for me to get everything out of the law that I should get. I just don't feel that he can give that to me and I am sorry to say that my being black and the victim being white, unfortunately due to the conditions of our society, it is going to influence him. I do believe and I feel totally uncomfortable and I beg the Court to relieve him from my case."

Then the following exchange between the judge and defendant Bernice Lewis occurred:

"THE COURT: You have heard the statement made by the Public Defender, Mr. Diamond. You have heard the statement under oath made by Mr. Sangster, is this not correct?

A. Yes, sir, I heard it.

THE COURT: What is your position with respect to the petition that Mr. Diamond has filed?

A. I would like to have him represent me if he would.

MR. DIAMOND: I will be willing to represent the lady. It has been raised. I want to make sure it is on the record so there is no question about it.

＊ ＊ ＊

THE COURT: Do you have any further statement?

A. No."

At the end of the hearing, the judge stated:

"THE COURT: I am aware of no conflict, no good reason the Public Defender can't represent Miss Lewis. ＊＊＊

MR. DIAMOND: Do I understand I have been appointed for Miss Lewis?

THE COURT: Yes."

Sangster's case was continued, and defendant, with attorney Diamond representing her, went to trial with her brother. While the record indicates disagreement between defendant's brother and his lawyer, the only apparent discord between defendant and her attorney involved the area of identification-alibi witnesses. On the fifth day of the

trial the judge explored disagreement which appeared to have arisen between defendant and attorney Diamond concerning the possibility of an alibi defense. During the discussion, attorney Diamond made it clear that he would abide by defendant's decision with respect to the alibi:

> "*** If she is going to order me to put on this alibi defense which I feel will not go over well, I will have no other choice but to put it on."

One factor in his assessment of the possibility of an alibi defense was the strength of the prosecution witnesses' identification of Bernice, placing her in Decatur. He had tested these identifications by his own photo lineup.

> "*** I went out to K-Mart and went up to several black women, and asked to take their pictures. After some difficulty I was able to get six women to let me take pictures of them. They were similar in age and height to my client. I accidentally got the K-Mart in the background. So I made arrangements with the Sheriff's office, asked them whether or not I could make arrangements for Miss Lewis to be taken out and have her picture taken so it would be the same background. The Sheriff cooperated. I then took the seven pictures to different witnesses and asked them if they could identify my client, to check out the alibi. And based on their information I felt that to say there was an alibi defense would be ridiculous. They identified Miss Lewis as being in Decatur, as being the person. ***"

Attorney Diamond indicated that Shirley Steele, an Iowa attorney whom the defendant knew, agreed with his assessment of the possibility of an alibi:

> "*** I talked to Shirley Steele on Saturday, and since Bernice has a lot of confidence in Shirley, I told Shirley we would be better off with no alibi; to say that Bernice wasn't here in Decatur, it is absurd to say she was in Iowa. Too many people have identified her. My advice to my defendant is that two men supposedly committed the armed robbery. No one ever identified my client as being present. *** Shirley Steele agreed

with me, and my client talked with Shirley Steele. I don't want to put on an alibi defense. I told my client I could do a better job putting on the witnesses I have. I have advised her not to testify. I think she is willing to go along with my trial strategy. However, if she wants to get up on the stand and say she was in Iowa, we'll have to wait for the witnesses. *** Miss Lewis agreed to go along with my strategy. ***"

Eventually defendant agreed with the decision not to call the alibi witnesses.

"MR. DIAMOND: Those people from Iowa are now present. *** However, I do not intend to use the witnesses, and Miss Lewis wants them to be in the courtroom to hear the rest of the case. I want to make it clear if they are in the courtroom, we can never call them as witnesses. Is that what you want? They are present—.

MISS LEWIS: I know.

MR. DIAMOND: You told me they are here. And I'm saying they can step in the courtroom, because I'm agreeing not to use them as witnesses.

MISS LEWIS: That's correct."

There is in the present case no claim of incompetency with respect to attorney Diamond's representation of defendant, which defendant's counsel at oral argument agreed had fairly been characterized as "vigorous." Nor was there in the present case any prejudice resulting from attorney Diamond's representation of defendant. At one point during the trial the judge stated that "there is certainly nothing that I have been able to see about counsel's handling of this case that leads to any criticism of them." Although defendant now criticizes attorney Diamond's advice to defendant that she not pursue an alibi defense on the grounds that the advice may have been subliminally influenced by his acquaintanceship with decedent, the record indicates counsel was energetic and thorough in checking the alibi defense, devising his own photo lineup to check the strength of the identifications by prosecution witnesses which would have

been used to destroy the alibi. He made clear the reasoning behind his suggested trial strategy. It was also made clear to defendant that the ultimate decision whether to rely on an alibi and whether to testify rested with her. She eventually agreed, with no protest, apparently influenced in part by the judgment of Shirley Steele to forgo calling the alibi witnesses.

We are thus confronted with the question whether a public defender's work-based acquaintance with a former probation officer murdered in the course of a robbery amounts to a conflict of interest such that the public defender's representation of one charged with murder, because of involvement in the robbery, would, without any showing of prejudice, deprive defendant of effective assistance of counsel in violation of the sixth and fourteenth amendments to the United States Constitution.

The sixth amendment right to counsel includes a correlative right to representation free from conflicts of interest. (*Wood v. Georgia* (1981), 450 U.S. 261, 67 L. Ed. 2d 220, 101 S. Ct. 1097; *Cuyler v. Sullivan* (1980), 446 U.S. 335, 64 L. Ed. 2d 333, 100 S. Ct. 1708; *Holloway v. Arkansas* (1978), 435 U.S. 475, 55 L. Ed. 2d 426, 98 S. Ct. 1173; *Glasser v. United States* (1942), 315 U.S. 60, 86 L. Ed. 680, 62 S. Ct. 457.) This court has fashioned a *per se* rule to protect this right to counsel. If a conflict of interest in the form of conflicting professional commitments is shown, defendant need not demonstrate any prejudice to justify reversal. *People v. Robinson* (1979), 79 Ill. 2d 147; *People v. Fife* (1979), 76 Ill. 2d 418; *People v. Franklin* (1979), 75 Ill. 2d 173; *People v. Coslet* (1977), 67 Ill. 2d 127; *People v. Kester* (1977), 66 Ill. 2d 162; *People v. Meyers* (1970), 46 Ill. 2d 149; *People v. Stoval* (1968), 40 Ill. 2d 109.

We should state at the outset that, in our judgment, the defendant waived her right to object to any supposed conflict of interest which her lawyer's acquaintance with the victim might pose. In our opinion defendant was

adequately informed of the significance of the supposed conflict and understood how it could arguably affect her representation (*People v. Stoval* (1968), 40 Ill. 2d 109). The dialogue between the judge and defendant on March 9, 1979, was short, but, as defendant's brief states: "The conflict here was not subtle nor the pressure subliminal." Rather, the problem, the possibility that acquaintance with a murder victim might indicate emotional ties which would interfere with counsel's representation of one charged with that murder, required no judge's explanation as a conflict resulting from legal complexities might. This court stated in *People v. Johnson* (1979), 75 Ill. 2d 180, 188:

> "The judge's failure to expressly state the obvious does not render ineffective an otherwise voluntary, knowing and understanding waiver."

Comprehension of the supposed conflict in the present case required neither a knowledge of the workings of an undisclosed contingent-fee arrangement (*People v. Meyers* (1970), 46 Ill. 2d 149, 152) nor understanding of "the subtleties of the laws of descent and distribution; the effect of a conviction for murder or voluntary manslaughter on her rights to inherit; the duties of an attorney for the administrator of her husband's estate; [or] the fiduciary relationship between the administrator and the heirs of an estate * * *." (*People v. Coslet* (1977), 67 Ill. 2d 127, 135.) Nor has defendant been shown to have been unaware of key facts concerning her attorney's loyalty at the time she waived the issue. (*People v. Kester* (1977), 66 Ill. 2d 162.) The United States Supreme Court stated in *Johnson v. Zerbst* (1938), 304 U.S. 458, 464, 82 L. Ed. 1461, 1466, 58 S. Ct. 1019, 1023:

> "A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver of right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience,

and conduct of the accused."

We believe that, under the circumstances of this case, including Sangster's statement and the nature of the supposed conflict, waiver ordinarily would be a sufficient ground on which to dispose of this case. However, because defendant's argument poses an issue which has not heretofore been discussed by this court, we deem it advisable to rule on its merits.

This court summarized its rule in *People v. Franklin* (1979), 75 Ill. 2d 173, 176:

> "This court has repeatedly stated that a defendant's fundamental right to effective assistance of counsel entitles the person represented to the undivided loyalty of counsel and prohibits a defense attorney from representing conflicting interests or undertaking the discharge of inconsistent obligations. [Citations.] In furtherance of this fundamental right, this court has adopted a *per se* rule which provides essentially that where defense counsel is involved in an actual or potential conflict of interest, it is unnecessary for the defendant to establish actual prejudice, as prejudice is presumed by law. [Citations.]"

Only in those instances where the conflict arose in counsel's professional relationships and obligations have the past decisions of this court dispensed with the requirement that prejudice be shown. In *People v. Robinson* (1979), 79 Ill. 2d 147, we did not deem a personal allegiance or loyalty to the public defender's office sufficient to justify a rule that if one attorney employed by such an office were disqualified by reason of a conflict of interest, no other attorney employed by that office could undertake the representation. We believe the facts of the present case do not warrant extension of our *per se* rule to supposed conflicts arising from personal relationships which do not involve substantial emotional ties.

The Supreme Court of North Carolina in *State v. Sneed* (1974), 284 N.C. 606, 201 S.E.2d 867, considered a situation

similar to the present case, and decided that defendant had not been deprived of effective assistance of counsel. Defendant there had complained that his attorney had been a friend of the policeman of whose murder defendant was accused. The attorney testified at a hearing to consider the conflict "that he knew Patrolman Wright and that they were friends. He knew of the public concern about Patrolman Wright's killing, but he did not feel that he would be adversely affected because he represented Sneed. He did not advise his client on the premise that it would or would not adversely affect him as a lawyer or an individual, but his advice was given solely on the premise that it would be helpful to his client." (*State v. Sneed* (1974), 284 N.C. 606, 610, 201 S.E.2d 867, 869-70.) That court stated that the sixth amendment required that counsel not be "hobbled by divided loyalties," citing, among other cases, our opinion in *Stoval,* but concluded:

> "This record does not support defendant's contentions that * * * counsel was fettered by divided loyalties. The evidence of record reveals that the relationship between counsel and the deceased patrolman was no more than that of casual acquaintances." (284 N.C. 606, 614, 201 S.E.2d 867, 872.)

Similarly, in the present case, attorney Diamond testified that his relationship with decedent was a "working relationship" and that he had never visited the victim's home. The lawyer's testimony that "my relationship was basically at work and I did consider him a friend" appears to indicate that the victim fell in that large group of not antagonistic persons with whom one has contact in the workplace. An attorney might be expected to attend the funeral of such acquaintances. This does not mean that he would be so influenced by emotion that he would be unable to judge the effect the relationship might have on his representation of his client. Nor do we agree with the appellate defense counsel's assertion that mere duration of such an acquaint-

ance makes it more than "casual." The character of a relationship is, in our estimation, determined by the quality, not the quantity of contacts. The supposed conflict in the present case is, in fact, even more attenuated than that in *Sneed*, since defendant in the present case was accused of murder by reason of involvement in the robbery, not, as in *Sneed*, by reason of firing the fatal shot.

An attorney is required to serve all segments of society, including those persons with whom he might personally feel little affinity. It should not be presumed that attorneys are unable to judge whether they can subordinate personal feelings to professional duty. The problem in *Stoval*, and in *United States ex rel. Miller v. Myers* (E.D. Pa. 1966), 253 F. Supp. 55), a case relied on in *Stoval*, and in the other cases in which we have applied a *per se* rule, was one of division of professional loyalties. Our *per se* rule does not, however, stem from any fear that attorneys would lightly abandon professional obligations or violate their oaths. Rather, we have simply deemed it inadvisable to subject an attorney to the ordeal of attempting to fairly discharge conflicting professional obligations to different clients. A concern eliminated by that rule is the possibility of undercompensation or overcompensation by attorneys involved in such situations. *United States v. Jeffers* (7th Cir. 1975), 520 F.2d 1256.

If the *per se* rule were extended to the present case, there would appear to be no appropriate limit to that rule. Much of the rationale urged with respect to personal acquaintance with victims would apply to acquaintance with witnesses, at least key prosecution witnesses. (See *People v. Robinson* (1979), 79 Ill. 2d 147; *People v. Stoval* (1968), 40 Ill. 2d 109.) A *per se* rule which disqualified a defense lawyer because of his acquaintanceship with law-enforcement officers who are to be called upon to testify at a criminal trial would, if carried to its logical conclusion, seem to preclude any localized practice by a criminal

defense attorney. Under such a rule, as the attorney handled more cases, and became more acquainted with law-enforcement personnel, he would be progressively restricted in the criminal cases which he could take. Finally, if such personal relationships pose *per se* disqualifying conflicts of interest, the ramifications of the rule would not be limited to criminal defense counsel, for prosecutors acquainted with defendants or their witnesses would face similar problems. And, in our judgment, the same considerations could well apply to civil litigation.

Extension of the *per se* rule to work-related acquaintances might also handicap efforts to provide adequate counsel for defendants, particularly in the smaller counties of the State. (See *People v. Robinson* (1979), 79 Ill. 2d 147.) In such counties all attorneys, or at least all attorneys having any substantial criminal practices, would likely be acquainted with local law-enforcement personnel and locally assigned State law-enforcement personnel. Accordingly, under the rule defendant urges us to adopt, it might well be the case that the better qualified local attorneys would be precluded from representing a defendant in a case similar to the present one. Defendants, or in the case of indigent defendants, society, might bear the added expense incident to distant counsel. Such defendants would be regularly deprived of advantages, including knowledge of local rules, procedures, and personnel, which local counsel might provide.

A defendant must demonstrate prejudice in order to obtain a new trial where the alleged conflict involves only his appointed attorney's personal workbased acquaintance with the victim, rather than some type of professional commitment or obligation toward that victim. Since no prejudice has been demonstrated in the present case, it is clear that no new trial is required.

Accordingly, the judgment of the appellate court is reversed, and this cause is remanded to that court for

consideration of issues there presented but not decided.

> *Reversed and remanded,*
> *with directions.*

JUSTICE SIMON, specially concurring:

I concur, except that I disagree with the court's holding that the defendant waived her right to object to any conflict of interest that might have existed.

The situation here, as the majority opinion sets it forth, is that attorney Diamond filed a petition stating that, because of his supposed conflict of interest, the two defendants (Bernice Lewis and Willie Sangster) felt he could not fairly represent them. A hearing followed to consider whether attorney Diamond should continue in the case. The court first asked Sangster how he felt about being represented by attorney Diamond. I would characterize his response as a strong negative. Sangster not only expressed the feeling that the attorney's previous friendship with the murder victim would interfere with the enthusiasm that was necessary for the attorney to represent Sangster but also observed that he felt the attorney would be influenced by the fact that the victim was white and the defendant was black.

Next, after noting that Bernice Lewis had heard Sangster's statement, the judge asked her to state her position. Lewis's response was a 180-degree turn from her position that counsel had indicated in the petition which initiated the hearing—that is, that attorney Diamond could not fairly represent her because of his friendship with the victim. I find nothing in Sangster's statement which could have led Bernice Lewis to change her position. Everything Sangster said was completely consistent with and supported the position that, according to the attorney's petition, Sangster and Lewis had been taking.

In these circumstances I feel that justice and constitutional guarantees required the trial judge to look further for

the defendant's reason for her dramatic shift in position. Her response, in view of her previously stated position and Sangster's statement, was totally unexpected. The judge, instead of accepting her response at face value and proceeding with Mr. Diamond as her attorney, had the responsibility of determining whether she really knew what she was doing. In making this inquiry the trial judge should have considered both the fact that the defendant was being tried a long distance from her home in Des Moines, Iowa, as well as her background, experience and education. (*Johnson v. Zerbst* (1938), 304 U.S. 458, 464, 82 L. Ed. 1461, 1466, 58 S. Ct. 1019, 1023.) The record does not show that the trial judge was presented with any of this information when he concluded there was no good reason Mr. Diamond could not represent the defendant.

Perhaps Bernice Lewis thought that if attorney Diamond did not represent her, the court would not provide other counsel. Perhaps she thought that after Sangster had injected racial issues into the proceedings with his statement, she, being black, could curry favor with the white judge and white defense attorney by acquiescence. Perhaps there were other motivations. Whatever the reason, the record is devoid of a satisfactory explanation for her change of mind and the trial judge, instead of accepting her reversal, should have delved deeper to find out the reason. I am not satisfied that what the majority accepts as a waiver was either knowing or voluntary, especially because the law raises every reasonable presumption against waiver of fundamental constitutional rights (*People v. Stoval* (1968), 40 Ill. 2d 109, 114), among which is the right to counsel guaranteed by the sixth amendment and provided by article I, section 8, of the Illinois Constitution of 1970.

I concur rather than dissent because, although the defendant's objection was not effectively waived, I agree with the majority that any conflict which existed was not a *per se* conflict and that no shortcoming has been shown in

the legal representation the defendant received. The general rule is that an indigent defendant is not entitled to counsel of her choice. (*People v. Cox* (1961), 22 Ill. 2d 534.) Where a *per se* conflict does not exist, this general rule is applicable. A defendant may as a matter of grace, and upon timely demand, be given new counsel when any perceivable conflict is slight and remote, as in this case. But, new counsel under such circumstances is not a matter of right. And, unless the defendant can show she was prejudiced by the representation she received, I agree with the majority that a new trial is not required. I also agree with the majority that Bernice Lewis has not made such a showing here, and thus join in the judgment of the court.