THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* GEORGE PURNELL, Defendant-Appellant.

First District (5th Division)   No. 82—2513

Opinion filed July 27, 1984.

Ackerman & Egan, Ltd., of Chicago (Allan A. Ackerman, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat and Garritt E. Howard, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LORENZ delivered the opinion of the court:

Following a bench trial, defendant was convicted of murder (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(a)(1)), and sentenced to an extended term of 60 years' imprisonment. On appeal, defendant contends that: (1) the State produced insufficient evidence to establish his guilt beyond a reasonable doubt; (2) his waiver of the right to a jury trial was ineffective by virtue of a constitutionally inadequate admonition; and (3) his trial counsel failed to perform at the accepted standard of competency. For the reasons stated below, we affirm the judgment of the trial court.

In its case in chief, the State's witnesses provided the following testimony. At 2 a.m. on August 27, 1981, the victim, Michael Lavin, arrived at 200 North Michigan Avenue, Chicago, to run computer tapes and cards at the offices of Computer Research, Inc., located on the fifth floor of the building. He had been employed by Programmers Investment Corporation, a computer research subcontractor, for approximately two years and had used Computer Research's facilities at least three times per week. As the victim entered the building, William Banik and Bill Young, employees of Computer Research, were leaving. The defendant, George Purnell, seated at the security desk in the lobby of the building and dressed in full uniform, saw Banik and Young leave the building and the victim enter. Defendant was employed by the CPP Security Service and had been assigned to the 200 North Building as a security guard for the past few weeks.

At approximately 2:30 a.m., defendant arrived at the service window of the fifth floor computer room wishing to speak with Robert Canan, lead operator for Computer Research. Canan testified that the defendant, dressed in his full uniform, told him that his briefcase was missing and that he thought either Banik, Young or the victim had stolen it, as they had all been in its general vicinity one-half hour earlier when they had passed through the lobby. Defendant determined that it was during this time that the briefcase disappeared. Canan stated that he knew nothing about the incident, and defendant left the fifth floor.

Banik and Young returned to the building at 3:30 a.m. and had a conversation with defendant in which defendant accused Banik, Young or the victim (who was not present at this time) of taking his

briefcase. Banik and Young told defendant they knew nothing about the stolen briefcase; they also observed defendant as dressed in full uniform at this time.

Defendant returned to the fifth floor at 4 or 4:30 a.m. and told Canan that he wanted to speak with the victim. The three met in the area adjacent to the fifth floor elevators, outside the offices, and defendant accused the victim of taking his briefcase. The victim denied any connection with defendant's briefcase, but produced a driver's license as identification at defendant's request. Defendant copied some information from the license into his notebook, and the victim then returned to the computer room. Defendant then told Canan that he knew "one of them took it" (referring to Banik, Young or the victim), and if he didn't get any satisfaction he would get it out on the street. Canan testified that defendant still had his uniform shirt on during this conversation.

At approximately 5 a.m., Banik and Young left their office to purchase some donuts. Defendant informed them that he would not permit them to leave the building as he ran to lock the front lobby door. However, defendant's supervisor, with him in the lobby, ordered defendant to allow the two men to leave, and he unlocked the door. Banik and Young returned to the building at 6 a.m., at which time they observed defendant dressed in full uniform.

Shortly after Banik returned, he observed the victim "hanging" tapes in the computer room. At approximately 6:30 a.m., Robert Canan viewed the victim on the TV monitor and saw him go through the fifth floor doors and enter the fifth floor elevator. He looked in fine physical condition. At 6:45 a.m., the freight elevator operator at the building for 12 years walked through the lobby on his way to report to his shift; he saw no guard at the security desk and no one in the lobby. At 6:48 a.m., John Zadelak, a student at Control Data Institute, located on the second floor of the building, came into the lobby and signed the log-in sheet. He observed defendant in the lobby dressed in a white T-shirt. He overheard defendant talking in a loud voice to another man, saying, "Someone stole my briefcase and if I lose my job because of it someone will pay."

Robert Cigler, the building superintendent at the 200 North Michigan Building for 15 years, arrived at work at 6:30 a.m. on August 27, 1981. He did not enter the building through the main lobby; using his key, he entered the building through the Garland Court entrance. (The Michigan Avenue main lobby entrance is the only entrance to the building which remains unlocked at all times. There are only two other entrances to the building, one on Lake Street

and the other on Garland Court, both of which require keys and remain locked at all times.) Cigler went directly down some stairs into the building's boiler room.

At 7 a.m., Frank Victor,* the building's elevator starter, 67 years old, came to see Cigler in the boiler room. Cigler observed no blood on Victor's person or clothing. The two men walked into the west portion of the building and ascended a set of stairs leading to the lobby. On the way there, they passed the building's utility room, which is situated one floor above the boiler room and one floor below the lobby. Outside the door to the utility room, Cigler noticed blood which appeared to be smudged on the floor and on the stairs leading up to the lobby. Cigler and Victor opened the door to the utility room, turned on the lights and saw the victim lying on the floor, covered with blood, his head "bashed in," and barely breathing. Cigler also observed fresh blood splattered all over the floor and walls of the utility room.

Following their discovery of the victim, Cigler and Victor immediately proceeded up the stairs leading from the utility room to the lobby and observed a stick propped up against the wall behind the opened door leading to the lobby. Cigler had seen this stick before, as it was normally kept in a locker room used by the security guards and elevator starter located immediately opposite the utility room where the victim was found. Cigler testified that he had seen defendant in this locker room before. Upon reaching the lobby at approximately 7:05-7:10 a.m., Cigler and Victor saw defendant seated at his security guard's desk in the lobby; defendant was not wearing his uniform shirt or his badge. They asked defendant if he knew that a young man was lying in the utility room covered with blood. Defendant told them in what Cigler described as a "choppy voice," that he knew "nothing about this" as he hadn't been downstairs. Cigler then asked defendant why he was out of uniform and defendant stated that some people upstairs had stolen his briefcase and shirt when he was making security rounds. Cigler told defendant that he had no business leaving the security desk and going upstairs. Cigler then instructed defendant to call the police; defendant refused to do so until he reported the incident to the CPP Security office. Following his call to CPP Security, defendant dialed the police and handed the phone over to Cigler so that he could report the attack. At this time, Cigler observed defendant's face to be sweaty, despite the fact that the building's air conditioning system was in operation

---

*Deceased by the time this case went to trial.

that day. Cigler then returned alone to the utility room to take another look at the victim. Upon his return to the lobby area at approximately 7:15 a.m., he testified that defendant was still present at the security desk, where to his knowledge he stayed until he was taken out by police.

On cross-examination, Cigler testified that there is a door located about 20 feet from the utility room which is equipped with an ADT alarm system. He explained that with this kind of alarm system, a security guard must insert a key into a box located at the door, give it a turn, pull out the key and allow the box to ring. The designated times for the "pulls" of the system for the morning of August 27, 1981, were 3:30 a.m. and 7:30 a.m. He testified that at 7:40 a.m. on August 27, 1981, he received a call from the ADT office alerting him that the 7:30 a.m. "pull" had not been made; he then asked Victor to go down to the door and make the "pull." Although he conceded that he did not see Victor do so, he testified that ADT did not call him again.

Police officers Jaglowski and Pechulis arrived at the scene and observed Cigler and Victor outside of the building; they saw defendant standing by his desk wearing a white T-shirt and dark trousers. On his way down the stairs leading from the lobby to the utility room with Cigler, Officer Jaglowski noticed dark and bloody footprints. He found the victim on the floor of the utility room in a fetal position, gasping for breath. The victim had a 2" x 2" x 1" hole in the top of his head; one side of his head was covered with blood, as were his neck and two-thirds of his torso. A pool of blood surrounded the victim as he lay on the floor. Jaglowski saw a snow shovel propped up against the north end of the utility room's wall; it was bent at the edges and covered with fresh blood. When the officer asked defendant if he knew anything about the incident, defendant responded, "I heard nothing, I know nothing and I saw nothing concerning an injured victim at the area of the premises." The officer instructed the building superintendent, elevator starter and defendant not to leave the building until the police could ascertain what had happened. He also testified that from the time he came back up to the lobby until the time the assist units arrived and he and his partner departed the scene, defendant had remained at the security desk.

The prosecution then introduced a stipulation as to what the testimony of homicide investigator John Markham would be if he was called to the stand to testify. He would testify that when he arrived on the scene, the victim had already been transported to the hospi-

tal. He interviewed several people, including Frank Victor, Robert Cigler, William Banik, Bill Young and John Zadelak. He also interviewed defendant, who told him that he knew nothing about the attack, but related that his briefcase and shirt had been stolen that night. After a thorough search of the entire area surrounding the scene of the crime did not locate defendant's shirt or briefcase, defendant was taken to Area One for questioning. Upon his arrival at the police station, blood was observed on his shoes; defendant was promptly advised of his constitutional rights. Detective Markham then took defendant's statement in which he denied any knowledge of the attack. Markham would also testify that at this time defendant told him that he had taken his shirt off after his first rounds at 12:30 a.m., had put it on top of his briefcase, and that his shirt and briefcase were taken together.

Defendant subsequently agreed to give the detective his shoes, clothing and numerous personal articles which he had wrapped in newspaper and magazine pages. These articles included defendant's leather belt, security guard shield, nameplate, handcuffs and case, scotch tape and dispenser, various leather goods, radio, black ballpoint pen, memo book and wristwatch. These items were inventoried and taken to the crime lab.

Detective Markham would also testify that at 3 p.m. on August 27, 1981, he had occasion to be in attendance at an interview between an assistant State's Attorney and defendant whereupon defendant told them that (1) at 5 a.m. he took his shirt off to go to the basement; (2) at 6 a.m. an unidentified woman came into the building and he discovered that his shirt was missing; and (3) his supervisor came at 3:30 a.m.

Through two stipulations introduced by the prosecution, it was adduced that the paramedics received a call at 7:25 a.m., arrived at the building at 7:28 a.m., and administered emergency treatment to the victim at the scene until 8:03 a.m. Dr. Thomas Brown examined the victim upon his arrival at Northwestern Memorial Hospital, and described multiple, compound and depressed fractures to the left side of the victim's skull where a portion of the victim's brain protruded out of his head. A vial of blood was taken from the victim prior to his skull reconstruction and left temporal lobectomy surgery at 12 p.m. The victim received many transfusions during this operation. Following this surgery, the victim lay in a deep coma. Two EEG scans showed no brain activity whatsoever. Two days later, on August 29, 1981, the victim was disconnected from a respirator and pronounced dead. Another vial of the victim's blood was extracted

by the medical examiner's office prior to his autopsy.

The prosecution introduced an additional stipulation that if called to the stand, microanalyst Cathy Mormon would testify that she conducted tests on both victim's and defendant's blood samples, as well as their personal belongings. Her tests revealed that both vials of victim's blood (pre-surgery and pre-autopsy) contained type A(N) blood; that victim's jeans, socks and shoes all had type A(N) blood present on them; that fluid recovered from the floor of the utility room proved to be type A(N) blood; that the shovel found in the utility room contained type A(N) blood; and that tests on victim's lighter, as well as on the wooden stick found behind the open door leading to the lobby, showed human blood present.

Mormon would also testify that her tests showed defendant to have type A(MN) blood. Various items taken from defendant and tested showed that his memo book, right shoe and trousers contained type A(N) blood; that his white T-shirt contained type A blood, but that further serological tests to determine the presence of M or N antigens were not possible due to the insufficient amount of sample present; that tests on his metal nametag, left shoe, white handkerchief, brown umbrella, tape dispenser, radio strap, handcuffs, wristwatch and socks all indicated the presence of human blood, but that the amount of blood available for testing was insufficient to determine the type. Finally, Mormon would testify that 10% of the population had type A(N) blood and 20% had type A(MN) blood; that type A(N) blood cannot come from a person having type A(MN) blood; and that type A(N) blood found on victim's and defendant's belongings was consistent with that coming from the victim and inconsistent coming from defendant.

For the defense, the stipulated testimony of evidence technician Wade Crosson was introduced. He stated that during his investigation of the scene of the crime, he examined the shovel and wooden stick for fingerprints, and got negative results from both items. He gave three interpretations for these negative results, as he did not recall which of the three situations existed when he completed his report on August 27, 1981. He stated the negative results could mean that (1) there were no identifiable ridge impressions suitable for comparison with others available; (2) there were no fingerprints, whether identifiable or not, at all; or (3) there were smudged fingerprints on these items which were unidentifiable.

In his own defense, defendant testified that on August 26, 1981, he arrived to work at 11:30 p.m. and proceeded to a bathroom located in the west end of the lobby, where he changed into his uni-

form. He stated that he had only been in the building's locker room once, and was never assigned a personal locker. At 1:10 a.m., he left his briefcase containing his civilian shirt, sandwich and other items at the security desk, locked the front lobby door and made a security check of the fourth through sixth floors. Upon his return to the lobby at 1:30 a.m., he found Banik and Young inside the lobby door waiting to exit the building. He also found the victim waiting outside the locked door. He unlocked the door, thereby allowing Banik and Young out, and the victim in. Defendant then relocked the lobby door and proceeded to the third floor to finish his security check of floors three through one. When he returned to the lobby at 2 a.m., he testified that he discovered his briefcase missing. He then went to the fifth floor to speak with Robert Canan (erroneously identified by defendant as Mr. Cavanaugh), who brought the victim outside the fifth floor computer room to speak with defendant. Defendant further testified that he did not accuse the victim of stealing his briefcase, but merely asked him if he knew anything about it. Defendant returned to his desk located in the lobby at 2:20 a.m. He questioned Banik and Young about his briefcase when they returned to the building at 2:30 a.m. After they denied having any knowledge as to its whereabouts, they returned to the fifth floor.

Defendant then testified that he called the Chicago Police Department at 2:45 a.m. to report his alleged stolen briefcase; he told the officer(s) who responded to the call that he suspected one of three persons of stealing it. He stated that the police spoke with Canan, Banik and Young in the presence of defendant. The victim was not present for this questioning. He testified that at 3:30 a.m., he left his post to make the required ADT pull, and returned to his desk. At 3:45 a.m., his CPP supervisor, Jeannie Collins, visited him in response to his call to CPP that defendant had made regarding his briefcase. Banik and Young were again present in the lobby at 4 a.m., whereupon Ms. Collins questioned them as to the whereabouts of defendant's briefcase. He further testified that he spoke with Canan and the victim regarding the briefcase and at this time requested identification from the victim. He also testified that it was at this time that the victim threatened to sue him.

At 5 a.m. defendant went to the basement of the building in search of his briefcase; he looked through numerous boxes and the storage room. At 5:30 a.m., he returned to the lobby from the basement, dusty and sweaty. He discovered that the uniform shirt he had taken off and placed on the top of his desk chair before he went to the basement was missing. He further testified that he reported his

missing shirt to the CPP office at 5:50 a.m. He also stated that he was behind the security desk from 5:40 a.m. to 7:30 a.m. During this time, he testified that he observed a newspaper boy enter the building at 6 a.m.; an unidentified woman arrived at 6:05 a.m.; another woman he identified as Ms. Lannigan arrived at 6:45 a.m.; and Frank Victor arrived at 6:46 a.m. Defendant stated that Victor came into the building, went to the west end of the main lobby and entered the door leading down to the utility room, closing it behind him.

Defendant denied that he first phoned the CPP office to report the victim's attack, but instead stated that he immediately called the "911" number when so directed by Mr. Cigler. He testified that at 7:35 a.m., he made his way to the west end of the building to make the 7:30 a.m. ADT "pull." He testified that he had to pass by the utility room to get to the ADT box; that after making the ADT "pull" he stepped inside the utility room to take a look; and that before he could react to a policeman's yell to "Watch out for the blood," he stepped on some blood that was on the floor of the utility room.

On cross-examination, defendant denied that he locked the lobby door at 4 a.m., refusing to allow Banik and Young to leave; admitted that he could have made his entries in his daily log sheet for August 27, 1981, before these incidents actually happened; admitted that his entry on his daily incident report at 7:15 a.m. gave the victim's name as Michael Lavin, but didn't remember who told him the victim's name; admitted that he kept his memo book in his shirt pocket, but that he had placed it in his desk drawer before he went down to the basement to look for his briefcase. He further denied that he had previously made a statement to an assistant State's Attorney on the day of the attack; that he'd taken his shirt off after he returned from the basement; denied that he had told Detective Markham that he took his shirt off after his first round of security checks at 12:30 a.m., put it on his briefcase and that the shirt had been taken with his briefcase; and denied that he told police that he never went to view the body in the utility room after it was discovered by Cigler and Victor.

The State's rebuttal witness, Patrick Belanger, operations manager for CPP Security, testified that a document, proffered by the State and entitled, "Supervisor's Daily Activity Report," dated August 27, 1981, was a record kept in the ordinary course of CPP's business. He testified that this document indicated that defendant's supervisor, Jeannie Collins, arrived at the scene at 4:20 a.m. on Au-

gust 27, 1981.

Following closing arguments, the trial court found defendant guilty of murder. After hearing the parties' arguments in favor of mitigation and aggravation, the trial court sentenced defendant to a term of 60 years. This appeal follows.

OPINION

Defendant first contends that the State produced insufficient evidence to establish his guilt beyond a reasonable doubt. He posits that the record does not support the conclusion that he was capable of committing this brutal assault-murder.

■ Initially, we note that the evidence of defendant's guilt is entirely circumstantial. It is well settled that a conviction may be sustained entirely upon circumstantial evidence. (*People v. Weaver* (1982), 92 Ill. 2d 545, 555, 442 N.E.2d 255.) However, it is necessary that "the proof of circumstances must be of a conclusive nature and tendency leading, on the whole, to a satisfactory conclusion and producing a reasonable and moral certainty that the accused and no one else committed the crime." *People v. Williams* (1977), 66 Ill. 2d 478, 484-85, 363 N.E.2d 801; *People v. Magnafichi* (1956), 9 Ill. 2d 169, 137 N.E.2d 256.

■ While it is defendant's position that "speculation, conjecture and (possibly) probability" point to defendant as the offender in the instant case, we believe the State has met its burden in its showing that the circumstantial evidence involved here is so strong as to negate all reasonable hypotheses of innocence and lead only to the conclusion that this defendant committed this murder. From our examination of the record, we conclude that the evidence here has satisfied this standard.

Defendant cites a string of cases which stand for the basic proposition that where proof is entirely circumstantial and there is a reasonable hypothesis arising from the evidence which is consistent with the innocence of the defendant, then this hypothesis must be adopted. (See *e.g., People v. Giangrande* (1981), 101 Ill. App. 3d 397, 400, 428 N.E.2d 503.) Although we agree with defendant's accurate restatement of the law, we find this rule inapplicable to the case at bar, as we believe there is no reasonable hypothesis in existence which is consistent with defendant's innocence.

In the instant case, we are presented not only with evidence of defendant's motive and opportunity, but with many inconsistencies in defendant's testimony regarding important occurrences preceding the discovery of the victim's brutally beaten body on August 27, 1981.

Initially we must consider defendant's possible motive for commit-

ting this crime. It has been established by no fewer than three prosecution witnesses—William Banik, Robert Canan and John Zadelak—that defendant was so angered by the disappearance of his briefcase on August 27, 1981, that he became completely preoccupied with its return. Because he believed Banik, Young or the victim to have taken his briefcase, defendant repeatedly badgered these men as to its whereabouts. His growing anger was illustrated by both his threat to Canan that he knew "one of them took it" (referring to Banik, Young or the victim) and if he didn't get any satisfaction "he would get it on the street," to his locking of the lobby door so as to prevent Banik and Young's exit from the building. This anger and agitation carried even further in time towards the end of defendant's shift as Zadelak recalled defendant's loud voice when he stated, "Someone stole my briefcase and if I lose my job because of it someone will pay."

Defendant's suspicion seemed to specifically point towards the victim when he returned to the fifth floor for a second time to question the victim, thereby demanding that he produce identification; he had not demanded this from anyone else that evening. Defendant's own testimony that the victim threatened to sue him for his continued harassment provides yet another reason why defendant would wish retaliation against the victim.

Both the testimony of the State's witnesses, as well as that of defendant, provide a 15-minute time gap in which there is no plausible explanation of defendant's absence other than an opportunity for him to have attacked the victim.

The defense posits that it was impossible for defendant to leave the security area, go through a door, down some stairs, brutally beat and batter the victim in the utility room and then totally bathe and cleanse himself and his clothing of all the remnants of the assault. Further, the defense states that no evidence was located that would implicate defendant in the crime.

We, however, find that the stipulated results of the microanalysis done on defendant's clothing and numerous personal articles very much lead towards defendant's implication in the attack. While it is defendant's contention that he got blood on his shoes when he peered into the utility room on his way back from making the ADT "pull," we find it difficult to understand just how this version explains the existence of type A(N) blood on his memo book and trousers, as well as the presence of human blood on such items as his umbrella, radio strap, tape dispenser, handcuffs, and his metal nametag, an item he claimed to have taken off his shirt and put in his drawer along with his memo book before his trip to the basement at 5 a.m. Cigler's testimony that

he received a call at 7:40 a.m. from ADT that the 7:30 a.m. "pull" had not been made, as well as the police officer's testimony that he had not seen defendant near the utility room, make defendant's story as to how he got the victim's blood on his clothes even more implausible.

Finally, defendant's testimony regarding the disappearance of his uniform shirt is riddled with inconsistencies, as is his testimony pertaining to the timing of the evening's events. In addition, the State argues that defendant's claim that he was seated at the security desk from 5:30 a.m. to 7:30 a.m., just 35-40 feet from the stairway leading to the utility room, but heard and saw nothing of the attack, is highly incredible; we agree. Cigler testified that upon his discovery of the victim in the utility room, he noticed that the door leading up to the lobby was open, as a stick was propped behind it. It is hard to believe that a security guard, trained to be observant, would hear and see "nothing" through an open door.

While there is no burden on defendant to prove his innocence, if he elects to explain the circumstances, he is bound to tell a reasonable story or be judged by its improbabilities and inconsistencies. (*People v. Neal* (1968), 98 Ill. App. 2d 454, 458, 240 N.E.2d 784.) Where the evidence is conflicting, it is the prerogative of the trier of fact to ascertain the truth. (*People v. Manion* (1977), 67 Ill. 2d 564, 578, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513.) In a bench trial, it is the province of the trial court to determine the credibility and weight of the testimony, to resolve the inconsistencies and conflicts therein, and to render its decision accordingly. (See *People v. Stringer* (1972), 52 Ill. 2d 564, 568, 289 N.E.2d 631.) A reviewing court will not reverse a criminal conviction unless the evidence is so improbable as to raise a reasonable doubt of guilt. *People v. Manion* (1977), 67 Ill. 2d 564, 578, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513.

We, therefore, conclude that defendant was proved guilty of the offense of murder beyond a reasonable doubt.

■ Defendant next contends that his waiver of the right to a jury trial was ineffective by virtue of a constitutionally inadequate admonition. He proffers a line of precedent which establishes that a trial court has a duty to ensure that defendant's waiver of a jury trial is not only expressly made, but also understandingly made. See *People v. Surgeon* (1958), 15 Ill. 2d 236, 238, 154 N.E.2d 253.

The State, however, maintains that the law is also clear that the failure of a defendant to raise an issue in a written motion for a new trial constitutes a waiver and the issue cannot be urged as a ground for reversal on review. (See *People v. Precup* (1978), 73 Ill. 2d 7, 16, 382

N.E.2d 227.) Further, the State contends that since this waiver rule applies to constitutional as well as other issues (*People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856), defendant has waived his right to raise this issue on appeal.

In the case at bar, all of these rules have some relevance to the position of instant defendant. However, defendant here additionally contends that he was denied the effective assistance of counsel. His claim is based in part upon his counsel's failure to file a post-trial motion. Because his claim of ineffective assistance of counsel is based upon counsel's failure to file a post-trial motion, we are compelled on appeal to determine whether any such contention is of substantial merit. (*People v. Knowles* (1979), 76 Ill. App. 3d 1004, 1009, 395 N.E.2d 706; *People v. Lamparter* (1977), 56 Ill. App. 3d 823, 827, 371 N.E.2d 997.) Consequently, we address the merits of defendant's contention.

Section 103—6 of the Code of Criminal Procedure (Ill. Rev. Stat. 1981, ch. 38, par. 103—6) provides every person a right of trial by jury unless understandably waived by defendant in open court.

While there is no specific formula for determining whether a defendant's waiver of his right to a jury trial is understandably made (*People v. Lewis* (1980), 89 Ill. App. 3d 840, 843, 412 N.E.2d 565), it is well established that whether a waiver is knowingly made depends on the facts and circumstances in each particular case. *People v. Lewis* (1981), 88 Ill. 2d 429, 437-38, 430 N.E.2d 994, *cert. denied* (1983), 456 U.S. 1011, 75 L. Ed. 2d 932, 103 S. Ct. 1501; *People v. Richardson* (1965), 32 Ill. 2d 497, 499, 207 N.E.2d 453.

The common law record before us reflects a waiver, which is presumed to be correct unless other facts in the record are contradictory. (*People v. Gentry* (1977), 48 Ill. App. 3d 900, 363 N.E.2d 146.) Further, our examination of the record presents us with the following jury waiver colloquy:

"THE CLERK: People of the State of Illinois versus George Purnell.

MR. VANCE: For the record, Lawrence Vance, V-A-N-C-E, your Honor. At this time I would tender the written jury waiver to the court and ask it be made a part of the record.

THE COURT: This is information No. 81—7011, which is a four-count information, Count 1 of murder, Count 2 of murder, Count 3 of armed violence. The Court will correct itself. It is only a three-count indictment. Is this your signature?

THE DEFENDANT: Yes, your Honor, it is.

THE COURT: You understand by signing this document you

are giving up your right to have twelve men and women picked by the State and your attorney to decide your guilt or innocence of this particular charge?

THE DEFENDANT: Yes, your Honor, I understand.

THE COURT: Understanding that, do you still wish to waive your right to a jury trial?

THE DEFENDANT: Yes, sir.

THE COURT: All right, jury waiver is herewith made a part of the record of today's proceeding. We will pass the case for five minutes."

Given this colloquy, defendant contends that because the trial court did not query defendant as to any threats or promises made to him in connection with his waiver, this admonition was "hardly constitutionally inadequate." He asks this court to "read between the lines" and make the inference that something based on matters not within the record happened before defendant's waiver which led to his waiver of "necessity."

We, however, find no merit in defendant's contentions. Here we are presented with a defendant who is an individual of some ability and education; he graduated from elementary and high school and has had three years of college training in the law enforcement field. Further, he has no history of mental illness or retardation.

■ In the present case, we believe that the trial court has performed its duty in a satisfactory manner. Based upon defendant's educational background, his statements that he understood the consequences of the jury waiver and that he did sign the waiver form, and absent any contrary evidence in the record that defendant was unable to comprehend the waiver proceeding, we believe there has been an adequate showing that defendant's waiver was both knowingly and understandably made.

We now turn to defendant's final contention that he was denied effective assistance of counsel. He maintains that his counsel's lack of preparedness was demonstrated by his failure to file pretrial motions for discovery, suppression of evidence, bill(s) of particulars, expert(s) (*e.g.*, fingerprints and blood analysis), or evidence of thefts or break-ins into the 200 North Michigan Building where the doors on either Lake Street or Garland Court were used to enter the building. In addition, he contends that his counsel's failure to make motions for a directed verdict as well as his failure to file a post-trial motion further indicate that he received ineffective assistance of counsel and is therefore entitled to a new trial.

Defendant cites *People v. Brinson* (1980), 80 Ill. App. 3d 388, 399

N.E.2d 1010, as being instructive to our resolution of the present case. In *Brinson*, the defendant contended that he was denied the effective assistance of his counsel based on three grounds: (1) his counsel failed to file a motion to suppress his inculpatory statement to the police; (2) his counsel did not move to suppress a pretrial or in-court identification by the victim; and (3) his counsel failed to develop and pursue the only trial strategy which was logical under the circumstances of the case. The *Brinson* court reversed defendant's conviction for armed robbery and held that defendant's representation by private counsel in this case was ineffective to such a degree that it was brought to the "sham or farce level, through [the] failure to adopt or present any logical or available theories of defense." 80 Ill. App. 3d 388, 394.

We believe the facts in our instant case to be distinguishable from those in *Brinson*. In the present case, defendant's privately retained counsel made vigorous arguments regarding the possibility that some-one other than defendant had the opportunity to commit the attack on the victim; aggressively cross-examined building superintendent Cigler with regards to the geography of the blood which was splattered around the victim's body; provided a very competent business-records argument against the admission of two of CPP's office reports, suc-cessfully excluding one report which the prosecution attempted to get into evidence; his trial objections were on numerous occasions sus-tained; and he attempted to rehabilitate his witness when faced with defendant's inconsistent statements to police.

■■ In Illinois, a single standard is now employed to determine the ineffective assistance of counsel. (*People v. Royse* (1983), 99 Ill. 2d 163, 170, 457 N.E.2d 1217.) The competency of counsel is presumed so that only strong and convincing proof of incompetency can overcome the presumption. (*People v. McCraven* (1981), 97 Ill. App. 3d 1075, 1077, 424 N.E.2d 23.) It is the burden of defendant to establish his trial coun-sel's actual incompetence through a showing of the substantial preju-dice resulting therefrom. (*People v. Witherspoon* (1973), 55 Ill. 2d 18, 21, 302 N.E.2d 3.) A court of review will not reverse a conviction based on the incompetency of retained counsel, unless this representation produced substantial prejudice to the defendant without which the result would probably have been different. (*People v. Greer* (1980), 79 Ill. 2d 103, 120-21, 402 N.E.2d 203.) "A defendant is entitled to compe-tent, but not perfect representation." *People v. Ortiz* (1981), 96 Ill. App. 3d 497, 503, 421 N.E.2d 556.

■■ ■ Defendant complains that his counsel's failure to call four potential defense witnesses (two of whom were defendant's parents) named in his single pretrial motion to testify, prejudiced him. Defend-

ant, however, fails to suggest what testimony, if any, these witnesses could have given. With regard to defendant's contention that his counsel failed to file any pretrial discovery motions, it must be noted here that defendant's trial counsel was the second attorney on defendant's case. He filed his appearance on January 12, 1982; at this time, the State's extensive answer to discovery had already been filed with the court. An amended answer to discovery was later sent to defendant's trial counsel on September 3, 1982. Therefore, the record is clear that defendant's trial counsel had access to all discoverable materials prior to the commencement of trial.

■■ Defendant also complains that his attorney made no pretrial motions to suppress or motions to produce certain evidence. Whether or not a motion to suppress should be filed is a matter of trial tactics which seldom have any bearing on issues of incompetency of counsel. (*People v. Hines* (1975), 34 Ill. App. 3d 97, 100, 339 N.E.2d 489.) In addition, defendant has not shown that such a motion would have been granted, nor that the outcome would have been different had such a motion been granted.

■■ Finally, defendant alleges that incompetency is evident from his counsel's failure to file a post-trial motion for a new trial. Where there are no substantial grounds for a new trial, a failure to move for one cannot demonstrate incompetency. (*People v. Cohen* (1980), 83 Ill. App. 3d 706, 404 N.E.2d 976.) As our disposition of this appeal shows, defendant has not demonstrated that he is entitled to a new trial.

Our examination of the entire record before us indicates that defendant was afforded effective assistance of counsel. In our judgment, defendant has shown neither incompetency nor the resultant prejudice necessary to be entitled to a new trial.

Pursuant to *People v. Nicholls* (1978), 71 Ill. 2d 166, 374 N.E.2d 194, this court awards the State costs in the amount of $50.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

MEJDA, P.J., and SULLIVAN, J., concur.