(No. 41318.—

The People of the State of Illinois, Appellee, *vs.* Veronica Crews, Appellant.

*Opinion filed February 4, 1969.*

RAYMOND J. COSTELLO, of Dundee, and GEORGE D. CARBARY and ROBERT A. CHAPSKI, both of Elgin, for appellant.

WILLIAM R. KETCHAM, State's Attorney, of Elgin, (W. BEN MORGAN, Assistant State's Attorney, of counsel,) for the People.

Mr. JUSTICE WARD delivered the opinion of the court:

The appellant, Veronica Crews, was found guilty of the murder of a two-year-old child after a bench trial in the circuit court of Kane County and sentenced to death. We affirmed the conviction on appeal (*People* v. *Crews,* 38 Ill.2d 331), but also found that the trial court had been influenced by materials improperly considered by it in the hearing in aggravation and mitigation. Since it could not be determined what sentence might otherwise have been imposed, we vacated the sentence of death and remanded the cause for resentencing. (38 Ill.2d at 339.) The trial court after a hearing resentenced the appellant to death, and she has appealed to this court for a review of the punishment again imposed.

The question posed is whether death was an appropriate sentence or whether the circumstances and background of the offender call for us to reduce the punishment imposed as may be done under Rule 615(b)(4) of this court.

It is appropriate to use our earlier opinion to recite some of the facts of the crime, and to describe the improperly conducted post-trial proceedings.

"On March 21, 1966, the victim, Lisa London, also known as Lisa Crews, a child of about 2 years of age, had been residing in the defendant's [appellant here] home for approximately a year. The defendant and her husband were arranging to adopt the child, who was the daughter of a sister of the defendant. On that morning, her husband having gone to work, the defendant was home alone with her 4½-year-old adopted son and Lisa. The evidence showed that about noon of that day Lisa had died. The defendant concealed the fact of the child's death from her husband until the following afternoon, Tuesday, March 22. Later on Tuesday, the defendant and her husband notified the police, who came to the defendant's house and found the dead child in her crib. * * *

"Donna Flynn, the defendant's cellmate, testified that the defendant gave her an account of the events of March 21 and March 22 as they related to the defendant. The witness related that the defendant told her that on the morning of March 21 she had spanked Lisa with a belt, after the child had turned on the hot water tap while in the bathtub. The defendant told Flynn that blood then came from the child's mouth and that she quickly expired. The defendant also admitted to Mrs. Flynn that she then washed and dried the belt in an effort to remove the blood and hair from it. Evidence introduced corroborated this described treatment of the belt, which was received as an exhibit. * * * Dr. Carlos Romero, a pathologist, testified that an autopsy he performed disclosed hemorrhages in the victim's brain, lungs and spleen, caused by injuries or blows; bruises and wounds over 60 percent of the body; and a broken right shoulder bone. The doctor further testified that his opinion, upon autopsy, was that death resulted from shock, caused by multiple blows. * * *

"Following the defendant's conviction on June 28, 1966, the trial court on June 30 commenced a hearing in aggravation and mitigation. The hearing was continued until July 8, 1966. At the conclusion of the hearing on July 8, and immediately before pronouncing sentence, the trial judge stated that he had searched the files of the Juvenile Division of the court and there had found what was apparently a caseworker's report. The report purported to relate what the woman, with whom Jeffrey [the appellant's 4½-year-old adopted son] had been temporarily placed, told the caseworker of Jeffrey's conduct in her home in a 3-day period subsequent to Lisa's murder. The caseworker concluded the statement, which the trial judge read into the record, by recommending that Jeffrey be made a ward of the court. The portion of the report which sets forth the foster mother's description of Jeffrey's conduct and conversation fills 5 legal sized pages of the transcript. The statements of Jeffrey, if made and if true, portray horrifying mistreatment of Lisa on other occasions by the defendant. It is plain that the trial judge was influenced by the report. This misconduct was denied by the defendant." 38 Ill.2d at 333-337.

After commenting that a judge with the solemn responsibility of determining the punishment of the convicted must take care to shield his mind from the prejudicial effect of unreliable and improper evidence, we observed: "However the 4½-year-old child, Jeffrey, was not present at the hearing and so far as we can determine was never seen by the trial judge. The court had no opportunity to appraise his relative maturity or immaturity, his understanding or incapacity to understand the necessity that truth be told and to consider other qualities going to the question whether reliance could properly be placed on what he said or might say. Also, neither the caseworker nor the temporary foster mother was called and they apparently were not known by the trial judge. We do not mean in making this observation to impugn their veracity but we deem that in

orderly procedure they should have been called and counsel for the defendant given the opportunity for cross-examination. Particularly, Jeffrey should have been available for examination by counsel, as well as by the court and State's Attorney." 38 Ill.2d at 338-339.

After our remandment a hearing was conducted in the trial court on March 4, 1968. The State first presented young Jeffrey, then 6 years of age. It was apparent from his responses to questions presented that the child was confused and did not properly understand the legal obligation to tell the truth. He was accordingly dismissed as a proposed witness by the trial court. The State then called the caseworker and the temporary foster mother who had been named in the report we have described. The caseworker was permitted to state that the appellant's husband had told her that the appellant had whipped Lisa and that the situation was aggravated, because his wife was jealous of Lisa, when he sought to intervene. The foster mother was not permitted to testify directly as to any statement made to her by Jeffrey concerning Lisa but was permitted through oblique questioning, to which objection was made, to testify by indirection that Jeffrey had told her that Lisa had been more severely punished than he by the appellant. Too, in this oblique fashion, over objection, she was allowed to say that the appellant had used a belt to punish Lisa. Permitting this material to be elicited from the witness was clearly improper. The trial court found at the hearing that Jeffrey at 6 years of age did not have the capacity to testify, yet allowed the foster mother to relate for its consideration what Jeffrey had told the witness when the boy was 4½ years old. The appellant offered as her only witness at this hearing a chaplain at Dwight Reformatory. The clergyman had been personally acquainted with her since her incarceration at that institution approximately two years earlier. The trial court, for reasons not challenged here by the appellant, refused to permit him to testify. At the conclusion of

the hearing that day, the trial court again sentenced the appellant to death.

The record of the original post-trial proceedings furnishes rather comprehensive information concerning the background, moral character, environment, habits, and emotional makeup of the appellant. The hearing in aggravation and mitigation conducted extends through some 165 pages of the transcript. Five witnesses, including the appellant and her husband, testified on her behalf.

The appellant is disclosed to have been 34 years of age when the crime was committed. She had no prior criminal record and, omitting consideration of this offense, had not displayed a tendency toward criminal conduct. She had been married for about 12 years, and seemingly the homelife of her and her husband had been secure and uneventful. The record shows that the appellant was fondly regarded by her husband, who testified, for one, that she had always been a "very good wife." She was well regarded by friends. As stated, the Crews also had a then 4½-year-old adopted son, Jeffrey. They had received the boy for adoption through a recognized child care facility shortly after he was born. Thereafter, the Crews had been investigated and approved as the child's adoptive parents. The appellant, from the record, had been an attentive parent to Jeffrey. The appellant's niece, Lisa, had come under their care in about the spring of 1965 and it appears her adoption by the appellant and her husband would have been completed on March 22, 1966, the day following Lisa's death. The record shows that the appellant had expressed extreme anxiety about her ability to care for Lisa. It reveals too, that she had been consuming excessive quantities of drugs of the amphetamine group, particularly Benzedrine pills. Dr. Harold Nelson, a psychiatrist, who had interviewed the appellant on several occasions, testified that this type of drug, which is employed as an anti-depressant, is "probably one of the most potent stimulants to the nervous system that we have." * * *

It is possible for her to get angrier under the effects of this drug * * * And simultaneously, it would also increase the intensity of the feelings, but reduce the ability to control those feelings."

Society is outraged by the murder of a child, but in determining punishment for the crime, care must be taken to insure that the punishment is appropriate and just. The doing of justice must include a consideration of background and circumstances which affect punishment.

Considering all that appears in this record it is our opinion that the penalty imposed by the circuit court is excessive. Accordingly, the judgment of the circuit court of Kane County sentencing the appellant to death is reversed and it is the judgment of this court that she shall serve a term of not less than 20 years nor more than 35 years in the penitentiary.

The Clerk of this Court is directed to enter an order reflecting this reduction of sentence.

*Reversed, with judgment here.*